**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| SUSAN MOORE and VALDAMAR ARCHULETA, <br><br> *Plaintiffs*, <br><br> vs. <br><br> SCHOOL DISTRICT NO. 1 IN THE CITY AND COUNTY OF DENVER AND STATE OF COLORADO BOARD OF EDUCATION, <br><br> *Defendant*. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No.: 1:26-cv-2985 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT

1.     Plaintiffs bring this complaint against School District No. 1 in the City and County of Denver and State of Colorado Board of Education, more commonly known as the Denver Public Schools ("DPS"), seeking declaratory and injunctive relief for violations of the Fifteenth Amendment to the United States Constitution and Section 2(a) of the Voting Rights Act ("VRA").  The Fifteenth Amendment and Section 2(a) prohibit any consideration of race in the drafting of school district lines. DPS explicitly enacted school board lines with an unconstitutional racial intent.

## INTRODUCTION

2.     Following the 2020 census, DPS redrew its five school board districts to make each district's population roughly equal. DPS considered three options (Maps A, B, and C) and passed Map C in April 2024.

1

3.    Map C is below.



Source: *Balancing Board Districts*, DENV. PUB. SCHS.,

https://www.dpsk12.org/page/balancing-board-districts (last visited July 1, 2026).

4.    These districts were drawn with illegal racial intent in violation of the Fifteenth Amendment and Section 2(a) of the VRA.

5.    The Fifteenth Amendment states: "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const., amend. XV.

6.    Section 2(a) of the VRA forbids enforcing election procedures enacted with a racial intent or that results in a denial, or abridgment, of the right of any citizen of the United States to vote on account of race. *See* 52 U.S.C. § 10101(a).  Section 2(a) is substantively synonymous with the Fifteenth Amendment.

7.    Map C violates these prohibitions. By DPS' own admission—during the public hearing process—the school district lines were deliberately drawn to engineer racial outcomes in

Districts 2 and 4. DPS intentionally and brazenly drew district boundaries to ensure Black and Latino racial majorities achieved race-based representation over Denver's increasing White population. The redistricting does not come close to satisfying the preconditions in *Thornburg v. Gingles*, 478 U.S. 30 (1986), does not satisfy any of the Senate Factors, and no analysis under *Thornburg* was even conducted by DPS in the redistricting process.

8.      Plaintiffs are Denver residents, taxpayers, and voters who were injured by DPS deliberately enacting district boundaries along racial lines for racial purposes. Plaintiffs will continue to suffer this injury while Map C is in place. This injury can only be redressed by this Court finding Map C to be a violation of Plaintiffs' civil rights. Plaintiffs seek an injunction prohibiting DPS from using Map C, appropriate damages, and attorneys' fees, including litigation expenses, expert costs, and costs, pursuant to 52 U.S.C § 10310(e) and 42 U.S.C. § 1988(b).

## FACTUAL AND LEGAL ALLEGATIONS

9.      Following the 2020 census, DPS redrew five school board districts to account for population changes. This population shift resulted in more White residents living in Denver, Colorado.

10.      DPS considered Maps A, B, and C, and selected Map C in April 2024.

11.      Under Map C, District 4 was reduced in size and population, but was intentionally and explicitly drawn to contain the historically Black neighborhoods of Five Points and Whittier. *See Exhibit* ("*Exh.*") 1, "*DPS Racial Presentation Slides*," at 12-13.

12.      District 2's size and population expanded but were drawn to maintain a majority Latino population. *Id.* at 15.

3

13.     When debating the maps, DPS considered the racial makeup of the proposed districts and intentionally drew the lines to ensure particular racial electoral outcomes in these districts. *See generally Exh.* 1.

## I.     Direct Evidence of Racial Motives

14.     Map C reduced District 4's population and geographic size but deliberately and explicitly retained the historically Black neighborhoods of Five Points and Whittier. *See Id.* at 12-13. "Our students being represented by people who look like them is really important," said Director Scott Esserman. DPS stated explicitly that these neighborhoods were included in District 4 to ensure Black control of the district and maintain a Black board member. Nico Brambila, *Denver school board approve redistricting map*, Denver Gazette, April 18, 2024, https://www.denvergazette.com/2024/04/18/denver-school-board-approve-redistricting-map-597cc1dc-fdc5-11ee-8ab4-0fac3ec2f8a9/.

15.     Similarly, Map C expanded District 2—represented by a Latino board member— to incorporate areas formerly in Districts 1, 3, and 5 to add Latino neighborhoods, including Sun Valley and La Alma/Lincoln Park. These neighborhoods were included to ensure Latino control of the District and to retain a Latino board member. Melanie Asmar, *Redistricting: Denver School Board Choses New Map*, Chalkbeat Colorado, Apr. 22, 2024, at 6:19 PM, https://www.chalkbeat.org/colorado/2024/04/22/denver-school-board-chooses-new-map-redistricting/.

16.     There is voluminous direct evidence of DPS' racial motives and racial intent. While the maps were being debated, board members, interest group representatives, and former board members explicitly announced their racial intent and purpose regarding their map preferences. Race saturated the debate. These include:

- Board Members Xóchitl Gaytán (District 2 and current President) and Marlene De La Rosa (District 5 and current Secretary) voted for Map B. Both claimed that Map B was favored by the Latino Education Coalition and got the most votes in a community survey. Melanie Asmar, *Redistricting: Denver School Board Choses New Map*, Chalkbeat Colorado, Apr. 22, 2024, at 6:19 PM, https://www.chalkbeat.org/colorado/2024/04/22/denver-school-board-chooses-new-map-redistricting/

- Board Member Gaytán also stated: "[i]t speaks to the concerns of our communities, our communities of color, the Black and Brown voices, and how they get diluted, right?" Denver Public Schools BOE Meeting 4/18/2024, 2:38:38, https://player.vimeo.com/video/936459136?&rel=0.

- Board Member Michelle Quattlebaum (District 4) stated: "I extend my heartfelt appreciation to the members of the Latinx community who have stood shoulder to shoulder with the Black community in advocating for equity. It is through this solidarity and recognition of shared struggles that we forge a path forward towards meaningful change. We must acknowledge the pivotal role of history in our quest for justice by understanding and confronting the legacy of oppression rooted in White supremacy. We paved the way for transformative action." Denver Public Schools BOE Meeting 4/18/2024, 2:26:40, https://player.vimeo.com/video/936459136?&rel=0.

- Board President Carrie Olson claimed choosing Map C was an act of resistance and empowerment that continues the cultural heritage of the area. When referring to Denver's gentrification, she stated: "[w]e can't stop where people move and who lives there, but we can, at least for the next seven years [time before the next federal census],

make sure those cultural icons are preserved." Melanie Asmar, *Redistricting: Denver School Board Choses New Map*, Chalkbeat Colorado, Apr. 22, 2024, at 6:19 PM, https://www.chalkbeat.org/colorado/2024/04/22/denver-school-board-chooses-new-map-redistricting/.

- President Olson also said: "[h]ow do you stop some of the inevitable things that are happening in our country, with gentrification, with communities of color being pushed out. And this person helped me think through some thoughts that I'd like to share because I also think Map C is the only one I can support at this time." Denver Public Schools BOE Meeting 4/18/2024, 2:45:30, https://player.vimeo.com/video/936459136?&rel=0.

- Board Vice President and CEO of the Center for Advancing Black Excellence in Education Auon'tai Anderson expressed concerns over risk of disenfranchising Black voters because of the increased number of White Denver residents. Nico Brambila, *Denver school board approve redistricting map*, Denver Gazette, April 18, 2024, https://www.denvergazette.com/2024/04/18/denver-school-board-approve-redistricting-map-597cc1dc-fdc5-11ee-8ab4-0fac3ec2f8a9/.

- When discussing redistricting and his support of Map C, At-Large Board Member John Youngquist stated: "[c]ommunity of interest is a piece that is especially of importance of value to me, as a White man serving and leading within our community, I want to listen to [as much] feedback [from] communities of color as I can to understand, make a decision [that] is of value to the community." Denver Public Schools BOE Meeting 4/18/2024, 2:31:05, https://player.vimeo.com/video/936459136?&rel=0.

- When discussing redistricting and her opposition to Map C, after asking another member to put the census demographics on the screen, Board Member De La Rosa stated: "as a board, we must base our decision on population numbers from 2020 and the specific legal requirements set forth in state law. We must also consider the impact on racial and ethnic concentrations in accordance with the Voting Rights Act and the US Constitution's Equal Protection Clause to ensure we avoid dilution of the minority vote." Denver Public Schools BOE Meeting 4/18/2024, 2:35:47, https://player.vimeo.com/video/936459136?&rel=0.

- In expressing his support for Map C, Board Member Scott Esserman stated: "I can't imagine that the passing of the Voting Rights Act in 1964 imagined the level of gentrification across our communities… And when we talk about breaking down systems of oppression, systems of oppression are those which would set our marginalized communities against each other in terms of their interests and not provide us with a clear answer." Denver Public Schools BOE Meeting 4/18/2024, 2:40:01; *see also* Nico Brambila, *Denver school board approve redistricting map*, Denver Gazette, April 18, 2024, https://www.denvergazette.com/2024/04/18/denver-school-board-approve-redistricting-map-597cc1dc-fdc5-11ee-8ab4-0fac3ec2f8a9/.

- In one of their board meetings, Board Member Esserman also said: "I would argue further that what we know right know is that where we need to make adjustments in population to actually make this look right are between four and two, which don't touch. So we can't make that move because that's what the law says." Denver Public Schools BOE Meeting 4/18/2024, 2:40:53, https://player.vimeo.com/video/936459136?&rel=0.

- Board Member Esserman followed this comment saying: "[t]hat our students being represented by people who look like them is really important, and that for now, we don't have to make the decision for 10 years down the road, or I guess less now… And so for me, the representation, the map that potentially enshrines representation in what has been traditional representation, is Map C." Denver Public Schools BOE Meeting 4/18/2024, 2:42:36; *see also* Nico C. Brambila, *Denver School Board Approve Redistricting Map*, Denver Gazette, Apr. 18, 2024, https://www.denvergazette.com/2024/04/18/denver-school-board-approve-redistricting-map-597cc1dc-fdc5-11ee-8ab4-0fac3ec2f8a9/.

17.    DPS explicitly used racial data to decide how to draw map lines.  DPS posted a redistricting presentation on April 5, 2024. Each slide for Maps A, B, and C feature the "ethnic breakdown" by district and slide 27 is titled Scenario Summary & Recommendations which featured an Impact on Racial/Ethnic Concentration category. *See Exh.*1, at 9, 11, 13. Additionally, slide 31 featured a detailed racial/ethnic composition of each of the five districts under each proposed map. Racial metrics played a central role in the information relied on in the decision-making process to adopt the map:

- Executive Director of Enrollment and Campus Planning for Denver Public Schools Russ Ramsey and Vice President for Education of the Gates Family Foundation evaluated the racial/ethnic concentration of each proposed map in comparison to the current distribution. The slide for this part of the video was titled: Analysis of Legal Requirements with a bullet point labeled Voting Rights Act Concerns with Diluting Any Community of Interest's Influence/Voice. Denver Public Schools, *Balancing Board Districts*, https://www.dpsk12.org/page/balancing-board-districts, at 13:08 (last visited July 1, 2026).

- MiDian Holmes, CEO of the Epitome of Black Excellence & Partnership, and Auon'tai Anderson issued a joint statement, stating: "[t]his area, renowned for its rich cultural heritage and historical significance as a hub of African-American culture, businesses, and historic schools such as Manual High School, Whittier K-8 School, etc., has been represented by a Black School Board member for many decades." Nico C. Brambila, *Denver School Board Approve Redistricting Map*, Denver Gazette, Apr. 18, 2024, https://www.denvergazette.com/2024/04/18/denver-school-board-approve-redistricting-map-597cc1dc-fdc5-11ee-8ab4-0fac3ec2f8a9/.

- DPS Director of External Communications Scott Pribble said that "[s]uccessful boundary redrawing relies on analyzing multiple types of data together, including enrollment projections, neighborhood demographics, school capacity, budget impacts, travel times, safe walking routes and school choice information, in addition to qualitative community insights." Sophia Villalba, *Denver Public Schools Considers Boundary Changes Amid Student Enrollment Decline*, Denver7, May 21, 2026, https://www.denver7.com/lifestyle/education/denver-public-schools-considers-boundary-changes-amid-student-enrollment-decline.

- Alexis Menocal Harrigan, a former candidate for the DPS Board, wrote:

  Redistricting is at long last complete with Board Members Marlene De La Rosa and Xóchitl Gaytán voting for Map B and the remaining members voting for Map C. The common theme among Map C supporters was that it kept historically Black communities in a district historically held by Black board members.

9

What surprised me was the board members who voted for C's blatant disregard of the results of the community survey which favored Map B consistently citywide. Ironically, the delay for finalizing redistricting was largely due to calls for more community input, which despite district attempts was meager at best. I doubt I would be writing about this topic if the board and community members who pushed so strongly for Five Points and Whittier to be included in Map C pushed just as hard for Black students to be reading at grade level.

*Racial Politics, Redistricting and the Denver School Board*, Boardhawk, May 1, 2024, https://boardhawk.org/2024/05/racial-politics-redistricting-and-the-denver-school-board/.

- In a published statement on redistricting, Auon'tai Anderson said: "[f]irst, let me share that when I and the board set forth to design new district maps, we did so with a sincere commitment to fairness and equity… Yet, despite our best intentions and efforts, certain groups, including the Latino Education Coalition, labeled our maps as racially biased." Auon'tai Anderson, *Statement for Denver School Board Vice President Auon'tai Anderson on Redistricting*, Medium, Oct. 27, 2023, https://auontaianderson.medium.com/statement-for-denver-school-board-vice-president-auontai-anderson-on-redistricting-765cf8f9f48c.

- In response to the redistricting, Latino Education Coalition Member Milo Marquez stated: "[t]hese two proposals look to us like deliberate gerrymandering... I think it's going to diminish the voting power of Latinos in District 2." Melanie Asmar, *Denver School Board Begins Redistricting Process with Two New Map Options*, Chalkbeat Colo.

10

(Feb. 14, 2023), https://www.chalkbeat.org/colorado/2023/2/14/23600209/denver-school-board-redistricting-two-new-maps-district-2-southwest-denver/.

- DPS Executive Director of Enrollment and Campus Planning Liz Mendez expressed concerns about the shift in demographics. She claimed that the majority Latino District 2 residents would be overshadowed by former District 1 White voters—who are more likely to vote in low-turnout school board elections—and the elected representative in that district could change. Melanie Asmar, *Denver School Board Begins Redistricting Process with Two New Map Options*, Chalkbeat Colo., Feb. 14, 2023, https://www.chalkbeat.org/colorado/2023/2/14/23600209/denver-school-board-redistricting-two-new-maps-district-2-southwest-denver/.

- CEO of Denver Families for Public Schools Clarence Burton Jr. claimed "he's concerned that two of the original four maps would move some historically Black neighborhoods like Five Points and Whittier from District 4, which often has elected a Black school board representative, into District 5, which hasn't." Melanie Asmar, *Denver School Board Begins Redistricting Process with Two New Map Options*, Chalkbeat Colo., Feb. 14, 2023, https://www.chalkbeat.org/colorado/2023/2/14/23600209/denver-school-board-redistricting-two-new-maps-district-2-southwest-denver/.

## II.     Racially Motivated Redistricting Violates the Fifteenth Amendment and the Voting Rights Act

18.     The Fifteenth Amendment states: "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const., amend. XV. Under the Fifteenth Amendment, "all citizens, regardless of race, have an interest in selecting officials who make

policies on their behalf." *Rice v. Cayetano*, 528 U.S. 495, 523 (2000) (holding that, under the Fifteenth Amendment, "voters are treated not as members of a distinct race but as members of the whole citizenry"). The Fifteenth Amendment's race neutrality requirement restrains DPS' authority to draw its districts. *Id.* at 522; *see also Gomillion v. Lightfoot*, 364 U.S. 339, 345 (1960) (declining to sanction "the achievement by a State of any impairment of voting rights [] so long as it was cloaked in the garb of the realignment of political subdivisions").

19. Section 2 of the VRA forbids enforcing election procedures enacted with a racial intent or that result in a denial, or abridgment, of the right of any citizen of the United States to vote on account of race. 52 U.S.C. § 10101(a). It is synonymous with the protection of the Fifteenth Amendment. *See City of Mobile v. Bolden*, 446 U.S. 55, 61 (1980); *Louisiana v. Callais*, 146 S. Ct. 1131, 1142, judgment entered, 146 S. Ct. 1131, 1142 (2026) ("Section 2 of the Voting Rights Act of 1965, 52 U. S. C. §10301 *et seq.*, was designed to enforce the Constitution— not collide with it.").

20. Any racial purpose or intent violates the Fifteenth Amendment and Voting Rights Act. It need not be the primary purpose to violate the Fifteenth Amendment, but here, race was the primary purpose behind the redistricting process.

21. A claim under the Fifteenth Amendment is distinct from claims brought under the Fourteenth Amendment. "Unlike the Fourteenth Amendment[], there is no room for a compelling state interest defense, as the Fifteenth Amendment's prohibition is absolute." *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000). "Racial discrimination need only be one purpose, and not even a primary purpose, of an official act" to violate the prohibition on election procedures enacted with racially discriminatory intent. *Velasquez v. City of Abilene*, 725 F.2d 1017, 1022 (5th Cir. 1984) (citing *Arlington Heights v. Metro. Dev. Hous. Corp.*, 429 U.S. 252, 265 (1977)).

12

Racial gerrymandering—deliberately drawing district boundaries for racial purposes and with racial means—circumvents the Fifteenth Amendment. *See Shaw v. Reno*, 509 U.S. 630, 639 (1993).

22. DPS may not use race to allocate power and thereby discriminate against "voters in elections to determine public governmental policies or to select public officials, national, state, or local." *Terry v. Adams*, 345 U.S. 461, 467 (1953); *see also Rice*, 528 U.S. at 512 (the Fifteenth Amendment "grants protection to all persons, not just members of a particular race"). This "prohibition on race-based voting restrictions is both fundamental and absolute." *Davis v. Guam*, 932 F.3d 822, 832 (9th Cir. 2019). The Supreme Court prohibited using of race in legislative line drawing absent a very narrow remedial purpose to specific discrimination. *Callais*, 146 S. Ct. at 1153 (finding "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."). Yet, drawing districts based on distinctions between citizens is exactly what DPS did.

23. DPS deliberately used race to draw district lines to maximize the voting power of Black and Latino residents for the explicit purpose of electing Black and Latino board members, rather than in response to any judicial remedy under the VRA. This violates the limits the Supreme Court placed on legislative enactments in *Callais*.

24. Race cannot serve as a basis for drawing electoral lines, at all. *See generally Callais*, 146 S. Ct. 1131.

25. Instead, DPS intentionally drew school board districts to consolidate members of different racial groups to maximize their electoral power. This is an example of the facially constitutionally odious "present-day intentional racial discrimination" prohibited by the Fifteenth Amendment. *See Callais*, 146 S. Ct. at 1141; *see also Shaw*, 509 U.S. at 657 ("[r]acial gerry-

13

mandering … may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters.").

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This action alleges violations of the United States Constitution and federal civil rights laws, affording jurisdiction under 42 U.S.C. § 1983.

27.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201(a) and 2202.

28.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(1), because the Defendant resides within this district, and under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claim occurred within this district.

## PARTIES

29.     Plaintiffs Susan Moore and Valdamar Archuleta are Denver, Colorado residents, voters, and taxpayers within DPS' jurisdiction who are concerned about their public school system and want any government board to be constituted free from illegal racial discrimination and illegal racial purpose.

30.     Defendant DPS is a party to this action because it is the official governing body of the Denver Public Schools. *See About the Board*, Den. Pub. Schs., https://www.dpsk12.org/o/dps/page/about-the-board (last visited July 1, 2026). DPS enacted Map C in violation of Plaintiffs' civil rights.

## STANDING

31.     A citizen of a state that unconstitutionally makes race a purpose of legislative line drawing is harmed.

14

32.     Plaintiffs were injured by Map C's racial redistricting. Plaintiffs will continue to suffer this injury while Map C continues to be in force. This injury can only be redressed by this Court declaring Map C unconstitutional and enjoining its use.

33.     Plaintiffs seek a declaratory judgment, injunctive relief, and attorneys' fees, including litigation expenses and costs, pursuant to 52 U.S.C § 10310(e) and 42 U.S.C. § 1988.

## CLAIMS FOR RELIEF

### Count I. Violation of the Fifteenth Amendment

34.     Plaintiffs reallege, as though fully set forth in this paragraph, all the preceding allegations of this Complaint.

35.     DPS acted under color of state law to deprive Plaintiffs of rights secured by the Fifteenth Amendment and 42 U.S.C. § 1983.

36.     The Fifteenth Amendment prohibits drawing maps with any racial intent, goal, or purpose.

37.     DPS intentionally used race to draw district lines in contravention of the Fifteenth Amendment. This intentional distortion of district boundaries for racial purposes violates Plaintiffs' Fifteenth Amendment rights.

38.     The use of race abridged and/or denied Plaintiffs' right to vote because DPS intentionally separated voters by race.

39.     The effect of DPS' redistricting was to intentionally give greater value to the votes of some racial groups, thereby discounting the value of votes of those groups not benefited.

### Count II. Violation of Section 2(a) of the VRA

40.     Plaintiffs reallege, as though fully set forth in this paragraph, all the preceding allegations of this Complaint.

15

41.      Section 2(a) of the VRA provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any state or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A violation of Section 2 of the VRA may be based upon the finding of a discriminatory purpose alone. *See Rice*, 528 U.S. 495.

42.      DPS cannot enforce a voting qualification, prerequisite or any standard, practice, or procedure that has any purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group. DPS' explicit reliance on racial criteria and purposes violates Section 2(a).

43.      DPS acted under color of state law to engage in discrimination based on race, color, and/or national origin in violation of: (1) the Fifteenth Amendment; and (2) Section 2(a) of the VRA , which can be enforced through 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray for entry of a judgment:

44.      Declaring that Map C violates the prohibitions on discriminatory purpose contained in the Fifteenth Amendment to the United States Constitution and Section 2(a) of the VRA;

45.      Declaring that Map C was adopted with an impermissible racial intent in violation of the guarantees of the Fifteenth Amendment to the United States Constitution and Section 2(a) of the VRA;

46.      An order enjoining DPS from further use of Map C;

47.    An order requiring DPS to adopt a new districting map without using any racial criteria;

48.    Ordering DPS to pay Plaintiffs' reasonable attorney's fees, including litigation expenses and costs, pursuant to 52 U.S.C § 10310(e);

49.    Ordering DPS to pay Plaintiffs' reasonable attorney's fees including litigation expenses and costs, pursuant to 42 U.S.C. § 1988 and any other applicable law, including costs of expert witnesses as allowed by the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006;

50.    Granting Plaintiffs such further relief, at law or in equity, to which the Court deems just and proper including all other injunctive relief available to the Court.

July 2, 2026                                                    Respectfully Submitted,

/s/ Jewel Lightfoot
Jewel Lightfoot
Kaylan Phillips
J. Christian Adams*
Joseph Nixon
PUBLIC INTEREST LEGAL FOUNDATION
107 S. West Street, Suite 700
Alexandria, VA 22314
Tel: (703) 745 5870
jlightfoot@publicinterestlegal.org
kphillips@publicinterestlegal.org
adams@publicinterestlegal.org
jnixon@publicinterestlegal.org
* *Application for admission forthcoming*

William Perry Pendley
Of Counsel
PUBLIC INTEREST LEGAL FOUNDATION
PO Box 1983
Evergreen, Colorado
Tel: (303) 324 7254
sagebrushrebel@reagan.com

Attorneys for Plaintiffs

Attorneys for Plaintiffs